[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff John Works (Works) and the defendant Stanley Gladysz (Gladysz) each own 50% of the stock of Stafford Wood Treatment, Inc. (SWT).
Works brings this action against Gladysz in his own name and (pursuant to Connecticut General Statutes § 52-572j) on behalf of SWT to enforce any rights the Corporation may have against Gladysz.
The action is in seven counts alleging that Gladysz converted certain corporate property to his own use, including a bulldozer, topsoil and/or fill material and money. Works also contends that the foregoing actions constitute theft, were fraudulent, were unfair and deceptive trade practices in violation of Connecticut General Statutes § 42-110b (CUTPA), and deprive SWT of its CT Page 6941 ability to reimburse Works for contributions he made to the Corporation.
Gladysz counterclaimed against Works alleging a secret agreement between Works and a real estate agent for kickbacks to Works, that Works pledged corporate property for personal loans, that he used corporate equipment for his own benefit, and that he sold corporate property in secret transactions for his own personal benefit.
 Factual Outline
In approximately 1983 Works and Gladysz decided to go into business together pressure treating lumber to be used in construction. They later formed the Corporation (SWT), each owned fifty shares of stock which was all of the outstanding shares. They purchased a used autoclave for pressure treating wood at an auction in the state of New York. Gladysz paid the full purchase price of $6,500. Works, who was a self-employed building contractor, moved the autoclave to a rigging company in the Worcester, Mass. area for storage until such time as it could be setup for operation in Connecticut. Works used his own truck and supplied the manpower to move the autoclave. The parties soon realized it would take hundreds of thousands of dollars in accessories and related costs to make the autoclave operable for its intended use, and they therefore abandoned their plan to pressure treat wood.
They then decided they would purchase raw land for subdividing and development. They hoped to develop 60 to 70 building lots from the tract known as Hillcrest Estates in the town of Stafford. In order to finance the development scheme they borrowed money from the Savings Bank of Manchester (which was secured by a mortgage). They also borrowed $41,135 from Josephine Gladysz (Stanley Gladysz's wife), which was never repaid. And they borrowed $34,500 from Alan Bacchiochi, (a local real estate developer), who was repaid from the sale of the lots. The principals also paid various corporate bills (which were, in effect, loans to the Corporation).
They purchased a John Deere bulldozer from LOMAC, Inc. which was financed by a purchase money loan secured by the bulldozer. Ultimately, that loan was in default but eventually LOMAC was paid and the bulldozer was sold by Gladysz. There was no written agreement between Works and Gladysz. They relied on oral CT Page 6942 understandings. Additional facts will be discussed throughout this opinion.
 Discussion of Claims
The plaintiff has listed the specific allegations against the defendant in paragraph ten of Count 1 in the complaint which he argues were a breach of Stanley Gladysz's fiduciary obligations to the Corporation, and he has briefed them in the following order.
First: Works claims that Gladysz wrongfully endorsed and cashed a check made payable to SWT from the town of Stafford for loam purchased from Hillcrest Estates. Gladysz did in fact receive that check, however, it was deposited to the SWT account (exhibit N) and Gladysz immediately then paid three of SWT's creditors $590 each, to wit, Festi's Oil Co., Willington Financial and Casio Co. (exhibit 16). The claim that Gladysz appropriated this check to his own use is without merit.
Second: Works claims that Gladysz removed material from the construction site (Hillcrest Estates) and converted it to his own use. There was evidence that some 700 to 800 yards of gravel was hauled from the construction site for use by Gladysz at the Gladysz residence. Works claims the value to be $4,700. There was also credible evidence that in 1994, when this was taking place Works was apprised on a regular basis of the number of loads being taken. Gladysz paid a trucker $1,400 to haul the gravel. From the evidence the Court finds the loam had a value of at least $4,000 but the evidence was vague as to an exact amount. There was also evidence that Works had some gravel removed to either his private property or that of his brother-in-law although it was only a couple of loads.
As far as the use privately of the SWT bulldozer it appears that both Works and Gladysz used that piece of corporate equipment privately from time to time. It appears to have been used for only a couple of days by Gladysz and substantially more by Works, who admittedly used it for at least two private construction jobs, and also let some of his construction company employees borrow it. Works did not keep records of the times the bulldozer was used or lent out by him for non-Hillcrest Estate jobs, but the Court concludes it was substantially a "wash" for the value of the gravel taken by Gladysz. The corporate record keeping was almost non-existent and the parties basically ran a CT Page 6943 loose verbal partnership arrangement. (There was also evidence that Works sold $1,100 of loam to a local developer).
Third: Works claims that Gladysz ultimately sold the bulldozer without his or the Corporation's authority and kept the proceeds. The bulldozer was purchased in May 1988 for $55,750. A down payment of $15,650 was made from the SWT account and the balance was to be paid at $1,444 per month for 48 months. When SWT did not have sufficient funds in its account to make the payments, Gladysz, in order to forestall repossession made payments from his own accounts between 1990 and 1992. These seven payments total $14,957.72. Works testified that he also contributed an equal amount, but his evidence as to that was not reliable. He could not produce any check records to substantiate his claim and blames the missing checks on either a secretarial oversight or else his prior attorney kept such records. His testimony on this issue was unreliable and unpersuasive.
In addition to the disparity of payments, the loan was finally paid off in full after a collection action was commenced with Gladysz contributing $767.88 more than Works to settle the final accounting (exhibit L).
To further refute Works's claim, there was evidence that in 1993 Works assigned his interest in the bulldozer to Alan Bacchiochi in exchange for a $15,000 debt from Works to Bacchiochi. Work's testimony that he is not sure the assignment was in the SWT bulldozer strains credibility, as does his claim that his secretary may have mistakenly assigned this particular bulldozer. It appears that Works no longer has an interest in the bulldozer, which was indeed sold by Gladysz for $19,500 net. However, as noted, Gladysz contributed $15,725 more than Works to its purchase.
Fourth: Works claims that Gladysz sold the SWT autoclave which had a value of $80,000 and kept the funds.
The autoclave was originally paid for by Gladysz. The cost was $6,500. It was kept at the D.B. Cotten Co. in Massachusetts and never used by the parties. Gladysz sold it for $8,500 in March 1996 to a paper mill company. The buyer testified that it cost $1,350 to have the autoclave shipped to their mill in upstate New York. From this testimony the Court finds the cost incurred by Works when it was first shipped from New York to Massachusetts was also approximately $1,350 (as opposed to the CT Page 6944 $6,500 advanced by Gladysz to purchase it).
The plaintiff's claim that the autoclave had a value of $80,000 is not supported by credible evidence. Exhibit P, an appraisal relied upon by Works was prepared for the purpose of listing SWT collateral for bank loans the Corporation was seeking. The market value is more accurate reflected in the actual purchase prices of $6,500 and $8,500 for this equipment. Gladysz, as stated, advanced $5,150 more than Works toward the purchase of this equipment.
Gladysz kept the proceeds from the sale of the autoclave and well as the bulldozer because he believed that he put more money than Works did into the Corporation and was therefore entitled to keep it.
It is impossible to accurately assess each party's contribution to SWT. Works claims his contributions exceeded those of Gladysz in that, since he was already in the contracting business, he supplied much of the tools, equipment and labor which went into the Hillcrest development; that he spent considerable time running the bulldozer on the site; that he supplied the office space by use of his construction company office and office equipment. Gladysz counters that he would regularly work at the site after he finished his day job as the plant superintendent at a mill in Stafford and that his habit was to work on the site until dark and then on weekends as well. He contributed equipment worth (he claims) $10,000 which was needed to operate a gravel crusher they had borrowed which was used by them to make gravel. When the gravel crusher was returned the rectifier he had supplied went with it.
The bookkeeping and records of SWT, to the extent they were kept, are not a model of clarity and this Court cannot conclude that Works has met his burden of proving Gladysz owes him for excess contributions to SWT.
It is noteworthy that the accountant for SWT testified that, while he did not keep the corporate books, he did the tax returns for SWT and for both the parties individually. In 1985, he showed shareholder loans to SWT of $45,908. He presumed the parties loaned equal amounts. No profits were ever distributed; neither party was ever compensated for his time and SWT's final tax return showed a loss of $166,000, which was distributed equally between the parties. CT Page 6945
It is also significant that Stanley Gladysz's wife, Josephine Gladysz lent the Corporation $41,135; which was secured by a first mortgage on a parcel of Hillcrest Estates property. It was expected that Mrs. Gladysz would be repaid out of lot sales. In fact she never was. She released her mortgage and as a result the engineering firm of Sreenath Symonds, who had a claim for engineering services became the first mortgagee and it later foreclosed on the parcel.
The parties stipulated that Mr. Gladysz would receive a credit for the amount of the mortgage as if he had paid his wife.
That more than wipes out any sums which might otherwise be owed to Works from the sale of the bulldozer even (if Works had any interest in it) and the autoclave, as well as any loam Gladysz removed from the site.
 Conclusion
The plaintiff has failed to prove he has suffered any losses due to the actions of the defendant as alleged in Count I. The subsequent Counts II through III are derivative and the plaintiff cannot prevail on those. The Court does not find the complaint is barred by laches.
For the foregoing reasons, judgment shall enter for the defendant.
As for the Counterclaim, the defendant has not proved Works breached his fiduciary duty to the SWT or to Stanley Gladysz in the ways alleged and judgment shall enter in favor of the plaintiff on the Counterclaim.
Klaczak, J.